Marvin **REINGOLD**, Plaintiff,

v.

**DELOITTE HASKINS & SELLS;**
**Yarwood Vane, and Leo**
**Bromberg, Defendants.**

No. 82 Civ. 5920 (GLG).

United States District Court,
S.D. New York.

Dec. 6, 1984.

---

Bernstein, Litowitz, Berger & Grossman, and Wendy, Adler & Liss, New York City, for plaintiff; Max Berger, Daniel L. Berger, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Deloitte Haskins & Sells and Yarwood Vane & Co.; Michael A. Cooper, William H. Knull, III, Melanie L. Cyganowski, New York City, of counsel.

Arter, Hadden & Hemmendinger, Washington, D.C., and Parker, Chapin, Flattau & Klimpl, New York City, for defendant Leo Bromberg; Marvin G. Pickholz, Edward B. Horahan, New York City, Laura Metcoff Klaus, Washington, D.C., Martin G. Bunin, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

The plaintiff brought this Rule 23(b)(3) class action against defendants Deloitte Haskins & Sells ("DH&S"), Yarwood Vane & Co. ("Yarwood Vane"), and Leo Bromberg on behalf of a class of all those who purchased American Depository Receipts (ADRs) in Ferrovanadium Corporation N.L. between January 1, 1980, and February 10, 1981.[1] The complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) ("Securities Exchange Act"), and Rule 10(b)(5) promulgated thereunder, 17 C.F.R. § 240.-10(b)–(5) (1984).[2]

Before the court are several motions. Yarwood Vane moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for

---

[1] This is the successor litigation to *Reingold v. Ferrovanadium Corp.*, 81 Civ. 1460 (Reingold I). The plaintiff herein also brought that action on behalf of a class and on the basis of facts identical to those in this action. The parties settled Reingold I on October 20, 1981. On February 24, 1982, the Court entered a Final Order and Judgment approving a $1,000,000 settlement and, *inter alia*, barring the prosecution of any further action arising out of the same circumstances. Excepted from the settlement were Ferrovanadium's present and past certified public and chartered accountants, their partners and affiliated entities, and Leo Bromberg. The plaintiff brings this action against those specifically excepted from the settlement bar in order to satisfy the claims filed after the Reingold I settlement.

[2] Section 10(b), 15 U.S.C. § 78j (1982), provides in pertinent part:

*Manipulative and deceptive devices:*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5 (1984), promulgated pursuant to section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

lack of personal jurisdiction. All the defendants move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted or, in the alternative, pursuant to Fed.R.Civ.P. 9(b), for failure to plead fraud with particularity. For the reasons stated below, the motions are granted in part and denied in part.

## I. *Background*

Ferrovanadium Corporation N.L. ("Ferrovanadium" or "the company") is an Australian corporation with its principal place of business in Perth, Western Australia. Allegedly, at all times relevant to this litigation, it was principally engaged in exploring for mineral resources in Western Australia. (Complaint ¶ 5.) In 1980, Ferrovanadium purchased a working interest in Texas gas wells through a wholly owned California subsidiary.

In early 1979, Leo Bromberg, a California attorney, responded to a Ferrovanadium advertisement in the Wall Street Journal which sought to attract United States companies as joint venture partners. On May 21, 1979, apparently after negotiations and a visit by Bromberg to Australia, Bromberg wrote Peter Briggs, Ferrovanadium's chairman. Bromberg's letter confirmed his understanding that Ferrovanadium was retaining him to qualify its securities in the United States under the Securities Exchange Act. The plaintiff alleges that Bromberg served as Ferrovanadium's attorney, agent and director of public relations in the United States. (Complaint ¶¶ 9 & 16.) The plaintiff further alleges that in exchange for substantial fees and a stock interest in Ferrovanadium, Bromberg undertook to see that Ferrovanadium complied with United States filing and disclosure requirements. (Complaint ¶¶ 9, 16 & 59.)

By letter dated July 31, 1979, Ferrovanadium advised its auditors, Yarwood Vane, that it intended to register its securities in the United States pursuant to the Securities Exchange Act. In 1979, "Yarwood Vane & Co." was a name employed by an Australian partnership of chartered accountants. For many years, Yarwood Vane maintained a correspondent relationship with the London firm of Deloitte, Plender, Griffiths & Co. and the United States firm of Haskins & Sells, *inter alia*, referring matters to and receiving matters from them. On July 1, 1975, Yarwood Vane received the right to use the name Deloitte Haskins & Sells from the Deloitte/Haskins Administrative Committee, an organization composed of members of the British and United States firms. The agreement between Yarwood Vane and the Administrative Committee formalized the long-standing correspondent relationship between the firms. Between 1975 and September 1, 1979, the Australian firm conducted its practice under two names. It performed engagements on behalf of Australian clients—like Ferrovanadium—under the name Yarwood Vane & Co. and performed work referred to it by its foreign affiliates under the name Deloitte Haskins & Sells. On September 1, 1979, the International Executive Committee that had supplanted the Administrative Committee entered into a new agreement with the Australian firm. The complaint alleges that in 1979, Deloitte Haskins & Sells and Yarwood Vane merged. Beginning December 1, 1979, Yarwood Vane conducted its entire practice under the name Deloitte Haskins & Sells. By 1979, the United States firm had also adopted the name Deloitte Haskins & Sells.

Ferrovanadium's July 31st letter requested that Yarwood Vane liaise with the Los Angeles DH&S office and either confirm that its accounts were acceptable to the Securities Exchange Commission (the "SEC") or inform Ferrovanadium of the most convenient means of conforming the accounts. On August 2, Robert Devenish, the Yarwood Vane partner in charge of the Ferrovanadium account, forwarded the audited 1978 and unaudited 1979 financial statements to the Los Angeles office. Between August 2 and August 16, the Los Angeles, New York, and Australian DH&S partners had several communications concerning the proposed registration. In one, Devenish revealed his doubts about the en-

tire registration. In another, Thomas Shephard, the Los Angeles partner, stated that he had discussed the registration with Bromberg. On August 16, the New York partners, Kenneth Allen and Edward Darcey, expressed their willingness to aid with the registration, but expressed reluctance to go forward until Devenish had eased his doubts regarding Ferrovanadium and its registration.

Meanwhile, on August 14, 1979, Devenish signed the Ferrovanadium audit for the fiscal year ending June 30, 1979, and forwarded that audit to the company. Two days later, Bromberg, who allegedly prepared and/or reviewed Ferrovanadium's Form 10, filed that registration statement with the SEC. The Form 10 contained the 1979 Ferrovanadium audit.

The plaintiff alleges that the registration was materially false and misleading in several respects. The plaintiff alleges that the 1979 audit was misleading in that it did not comply with United States generally accepted accounting practices ("GAAP") and nowhere revealed its noncompliance. Consequently, the plaintiff asserts, the audit overstated Ferrovanadium's equity and understated its expenses. (Complaint ¶ 25.) In addition, the plaintiff alleges that the Form 10 contained numerous false and misleading statements regarding Ferrovanadium's mining prospects. (Complaint ¶ 26.)

The complaint alleges that Yarwood Vane consented to and permitted the inclusion of its 1979 audit in the SEC filing. (Complaint ¶ 46.) The plaintiff further claims that although DH&S and Yarwood Vane knew of the Form 10 filing, and although they discussed taking corrective action, they failed to correct or reveal the alleged misrepresentations and omissions.

The Ferrovanadium registration automatically became effective 60 days from the filing date. On November 8, 1979, the SEC wrote Ferrovanadium commenting on the numerous deficiencies in the Form 10 and in the financial statement therein.

On or about December 14, 1979, Irving Trust Company filed a registration statement on Form S–12 pursuant to Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1982). The Form S–12 was a prerequisite to the registration and issuance of Ferrovanadium ADRs in the United States. "An ADR is a certificate, denominated in shares, representing proof of ownership of foreign securities on deposit with a foreign depository bank affiliated with an American bank." (Complaint ¶ 5n.) Trading in Ferrovanadium ADRs allegedly commenced on the United States over-the-counter market in January, 1980. Complaint ¶ 17.

On or about May 9, 1980, Morgan Guaranty Trust Company filed a similar Form S–12. Like Irving Trust's filing, that form included Ferrovanadium's 1979 Annual Report to Shareholders and an "Exploration and Activity Report." The plaintiff alleges that the "Exploration and Activity Report" contained materially false and misleading statements regarding the company's mining and overall business prospects. (Complaint ¶ 29.)

In 1980, the Australian DH&S partners audited the Ferrovanadium accounts. The Australian partners requested and received assistance with that audit from the United States partners. Specifically, the Denver and Los Angeles DH&S offices assisted with the audit of Ferrovanadium's wholly owned California subsidiary. On November 12, 1980, Devenish signed and issued the audit for the fiscal year ending June 30, 1980 ("the 1980 audit"). The plaintiff claims that when Devenish signed the audit, the accountants knew that Ferrovanadium securities were trading in the United States and that Ferrovanadium was required to periodically file financial statements with the SEC. The defendants dispute this allegation. The complaint alleges that on or about November 11, 1980, Ferrovanadium disseminated its 1980 Annual Report to shareholders and the investing public. (Complaint ¶ 30.) On January 21, 1981, a Form 10–K updating Ferrovanadium's registration was filed with the SEC. Both the annual report and the Form 10–K incorporated the 1980 audit.

The plaintiff alleges that the 1980 Annual Report and the 1981 Form 10-K were false and misleading in much the same way at the original Form 10, *i.e.*, the financial statements therein did not comply with United States GAAP and both documents contained false and misleading statements about Ferrovanadium's mining and business prospects.

The plaintiff purchased 2,000 Ferrovanadium ADRs on January 6, 1981. On February 10, 1981, the SEC suspended trading in Ferrovanadium ADRs. (Complaint ¶ 65.) A consent order was entered and trading resumed on April 6, 1981. (Complaint ¶ 66.) On September 3, 1982, the plaintiff brought suit on behalf of all persons who purchased Ferrovanadium ADRs between January 1, 1980 and February 10, 1981. (Complaint ¶ 10(b).)

The complaint asserts claims against Bromberg, Yarwood Vane, and DH&S. The complaint alleges primary violations of Rule 10b-5 by Bromberg in relation to the 1979 and 1980 Annual Reports, the Form 10, the Morgan Guarantee Form S-12, and the 1980 Form 10-K. (Complaint ¶ 61.) It also asserts claims against Yarwood Vane for issuing an allegedly misleading 1979 audit (Complaint ¶¶ 46 50) and for aiding and abetting the issuance of materially false and misleading statements in the Form 10. (Complaint ¶ 51.) The plaintiff similarly charges DH&S with regard to the 1980 Annual Report and Form 10-K. (Complaint ¶¶ 55-58.)

## II. *The Parties To This Action*

The complaint in this action names three defendants: "Deloitte Haskins & Sells; Yarwood Vane & Co.; and Leo Bromberg." Yarwood Vane & Co. is the Australian firm of chartered accountants that performed Ferrovanadium's 1979 audit. Yarwood Vane later assumed the name "Deloitte Haskins & Sells." However, the identity of the "Deloitte Haskins & Sells" firm sued by plaintiff is unclear.

The plaintiff considers DH&S a single worldwide entity.[3] Indeed, the complaint asserts that Yarwood Vane merged with this DH&S entity. (Complaint ¶ 7.) This is simply not the case. (For further discussion, *see infra* pp. 1252-1254.) There is no single worldwide DH&S firm. Rather, an association known as DH&S International is the only worldwide DH&S entity. DH&S International is an organization composed of a large number of affiliated accounting firms. Its offices are at 1114 Avenue of the Americas. Nowhere do the plaintiff's papers indicate that he wished to sue this umbrella organization.

A paragraph by paragraph examination of the complaint reveals that the references to defendant "Deloitte Haskins & Sells" refer in two instances to the Australian accounting firm that succeeded to the local accounting work of Yarwood Vane, and in another instance to the United States DH&S partnership.[4] Paragraphs 53 through 58 of the complaint describe DH&S as Ferrovanadium's independent auditor. In addition, paragraph 53 alleges the DH&S performed the 1980 Ferrovanadium audit. Affidavits provided the Court clearly indicate that the Australian firm with the DH&S name ("DH&S (Aus.)") served as Ferrovanadium independent auditor and issued the 1980 audit. We thus deem paragraphs 53 through 58 to assert claims against DH&S (Aus.) in connection with the 1980 audit.

Paragraph 52 is another matter. It asserts a claim against DH&S, rather than Yarwood Vane, for aiding and abetting the issuance of materially false and misleading statements in the 1979 audit, the 1979 Form 10, the 1979 Annual Report, and the

---

3. At oral argument, Max Berger, attorney for the plaintiff, said, "I believe the [partnership] agreements clearly support the proposition that Deloitte Haskins & Sells is one worldwide entity. That's who we had intended to sue. The only reason why we had sued Yarwood Vane in addition is because of the predecessor nature of that firm." Transcript of oral argument, May 20, 1983, at 3.

4. The plaintiff has not distinguished between the Australian and United States DH & S affiliates. Any further papers should distinguish among DH & S firms.

May 1981 Form S–12. In this context, we read DH&S to refer to the United States accounting firm ("DH&S (U.S.)"). The plaintiff's memoranda refer specifically to the United States firm's actions relative to the 1979 audit and the associated filings. *See, e.g.,* Plaintiff's Supplemental Memorandum at 3–12 (detailing communications between the United States and Australian affiliates regarding the 1979 audit and describing work performed by the United States affiliate on the 1980 audit).

Although we forego a literal interpretation of the pleadings in this regard, our interpretation accords with Fed.R.Civ.P. 8(f)'s requirement that all pleadings be construed to do substantial justice. Rule 8(f) reflects the basic philosophy of the federal rules, that they be construed to ensure the just, speedy, and inexpensive determination of every action. Fed.R.Civ.P. 1. The federal rules therefore instruct us "to make a determined effort to understand what a pleading is attempting to set forth and to construe the pleading in [a pleader's] favor whenever justice so requires." C. Wright & A. Miller, *Federal Practice and Procedure* § 1286 (1969). Our decision to construe this pleading as asserting claims against both the Australian and United States DH&S firms follows this dictate.[5]

### III. *Discussion*

#### A. *Motion to Dismiss for Lack of Personal Jurisdiction*

Defendant Yarwood Vane moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction. Although the defendant's original notice of motion and supporting memorandum named only Yar-

wood Vane, precisely which parties are the subject of this motion is again unclear. Since the defendant filed its motion, it has become clear that a question also exists regarding this Court's personal jurisdiction over DH&S (Aus.), which succeeded to Yarwood Vane's local business in December 1979. Both of the named accountant defendants dispute the Court's jurisdiction over the successor firm. In fact, their joint counsel separately challenges the Court's jurisdiction over the two Australian entities (DH&S (Aus.) and Yarwood Vane). In these circumstances, logic dictates that we treat this as a motion to dismiss claims against both Yarwood Vane and DH&S (Aus.) for lack of personal jurisdiction.

■ In deciding this pretrial motion to dismiss for lack of personal jurisdiction, we have considerable procedural leeway. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). In the exercise of this flexibility, we permitted considerable discovery on the jurisdictional issue. Both parties have proferred numerous affidavits, documents, and depositions to support their positions. However, we forewent an evidentiary hearing. In order to defeat the motion to dismiss, the plaintiff must make "a prima facie showing of jurisdiction through its own affidavits and supporting materials notwithstanding any controverting presentation" by the defendant.[6] *Id.* We believe the plaintiff has made such a showing only with regard to DH&S (Aus.)'s actions respecting the 1980 Ferrovanadium audit.

■ Section 27 of the Securities Exchange Act[7] provides the statutory basis for the exercise of personal jurisdiction in

---

**5.** There may remain issues as to the adequacy of service of process over the Australian firm. However, in light of the ultimate disposition of this motion, we need not address those issues at this time.

**6.** "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *cert. denied,* 104 S.Ct. 1001 (1984).

**7.** The section reads in pertinent part:

Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. 15 U.S.C. § 78aa (1982).

securities cases. Section 27 extends the court's jurisdiction to the limits of due process. *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972) (Friendly, J.). Sections 35–37 of the *Restatement (Second) of Conflict of Laws* (1971) ("Restatement") supply the applicable jurisdictional standard. *Id.* These sections contain three distinct bases for the assertion of jurisdiction over a foreign defendant in a securities action. A court may exercise personal jurisdiction over a foreign defendant who (1) does business in the forum (Restatement § 35); (2) does an act in the forum (Restatement § 36); or (3) causes an effect in the forum by an act done elsewhere (Restatement § 37).

Although the Restatement successfully distills the Supreme Court's edicts regarding personal jurisdiction into a set of helpful guidelines, *see Calder v. Jones,* —— U.S. ——, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (citing Restatement § 37), the Supreme Court's pronouncements continue to weigh heavily in this area. The Court has stated that, to survive due process analysis, the exercise of jurisdiction over a defendant must "not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). A "[d]efendant's conduct and connection with the forum state [should be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). The Court's most recent decisions reiterate these principles, and, in addition, emphasize "the relationship among the defendant, the forum, and the litigation." *Calder v. Jones, supra,* 104 S.Ct. at 1486; *Keeton v. Hustler Magazine,* —— U.S. ——, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (both quoting *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

The plaintiff argues that Restatement §§ 35, 36 and 37 each provide an adequate basis for the exercise of personal jurisdiction over Yarwood Vane and DH&S (Aus.). We find that only Restatement § 37 provides a basis for the exercise of jurisdiction and then only in very limited circumstances.

### 1. *Doing Business: Restatement § 35*

In pertinent part, Restatement § 35 reads:

(1) A state has power to exercise judicial jurisdiction over an individual who does business in the state with respect to causes of action arising from the business he does in the state.

. . . . .

(3) A state has power to exercise judicial jurisdiction over an individual who does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction.

*Restatement (Second) of Conflict of Laws* § 35 (1971). Since neither Yarwood Vane, nor its successor, DH&S (Aus.) does any substantial or continuous business in the United States, the plaintiff attempts to attribute DH&S (U.S.)'s forum-related contacts to Yarwood Vane and DH&S (Aus.). First, the plaintiff argues that DH&S (Aus.) is an agent of DH&S (U.S.). This agency relationship, he argues, provides a basis for concluding that Yarwood Vane and DH&S (Aus.) did or do business in the United States and that the cause of action arose from that business. Second, the plaintiff might argue that DH&S (Aus.) is a mere department or agency of DH&S (U.S.).[8] Both arguments fail. Thus, the plaintiff may not premise jurisdiction over Yarwood Vane or DH&S (Aus.) on Restatement § 35.

---

**8.** It is unclear whether the plaintiff argues that Yarwood Vane is or was a "mere department or agency" of DH & S (U.S.).

#### a. *Background*

Before analyzing the merits of these arguments, we briefly consider the relationship between the Australian and American firms. This discussion supplements the "Background" section above and facilitates an understanding of our conclusion regarding the plaintiff's doing business argument.

As noted above, the July 1, 1975, agreement between Yarwood Vane and the Deloitte/Haskins Administrative Committee formalized a long-standing correspondent relationship. The agreement established an "Executive Committee" composed of the Administrative Committee and a Yarwood Vane partner. The Executive Committee received the right to approve all changes in the partnership agreement, to approve all partnership decisions, and to demand the resignation or appointment of any partner. The parties also agreed to use their best efforts to refer business to each other and to take on business referred to them by each other. Yarwood Vane agreed to pay 10% of all gross fees paid to it as a result of referrals from another DH&S firm to the referring firm. They further agreed to abide by certain professional and ethical standards established by the Executive Committee when doing work referred by another DH&S affiliate. The firm retained the right to direct its own day-to-day operations, to choose its Australian clients and to direct its own administration, accounting, and profit distribution. The agreement did not provide for profit sharing between any of the affiliated firms.

Between 1975 and September 1, 1979, the Australian firm conducted its practice under two names. It performed engagements on behalf of Australian clients like Ferrovanadium under the name "Yarwood Vane & Co." and performed work referred pursuant to the 1975 agreement under the name "Deloitte Haskins & Sells." Pursuant to the 1975 agreement, four British, Haskins & Sells partners became partners in the Australian firm registered under the name of Deloitte Haskins & Sells. They did not become partners in Yarwood Vane.

By agreement dated July 1, 1976, firms throughout the world which maintained correspondent relationships with the Deloitte/Haskins group entered into an international practice agreement. Among other things, this agreement established an International Executive Committee composed of one permanent representative from Deloitte, one permanent representative from Haskins & Sells and three other elected representatives. The International Executive Committee supplanted the Administrative Committee.

On September 1, 1979, the International Executive Committee entered into a new agreement with the Australian firm. Pursuant to that agreement the four English partners resigned from the Australian firm. The International Executive Committee also relinquished the right to veto the Australian firm's partnership decisions. The agreement also limited its veto to matters affecting the relationship between the various affiliated firms. The 1975 and 1979 agreements were similar in most other respects.

Beginning December 1, 1979, the Australian firm began conducting its entire practice under the name "Deloitte Haskins & Sells." It continues to do so. DH&S (Aus.) has no office in the United States and has no partners or employees regularly residing or conducting the firm's business here. The firm does not solicit business in the United States, maintains no books, records, or bank accounts in the United States, and is not licensed to do business in any state.

#### b. *Discussion*

The plaintiff asserts that since 1975, when Yarwood Vane first contracted to use the DH&S name, Yarwood Vane and later DH&S (Aus.) have been agents of DH&S (U.S.). The plaintiff argues that this agency relationship justifies the exercise of jurisdiction over Yarwood Vane. He thereby seeks to apply a theory by which courts generally establish jurisdiction over a nonresident principal by virtue of the actions of its resident agent. *Product Promotions v. Cousteau*, 495 F.2d 483, 492 (5th

Cir.1974). According to the plaintiff, this Court should attribute the acts of a resident principal to a nonresident agent. While the plaintiff is not the first to suggest such an approach, *see Walker v. Newgent,* 583 F.2d 163 (5th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *Blount v. Peerless Chemicals (P.R.) Inc.,* 316 F.2d 695 (2d Cir.), *cert. denied,* 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963); *Grove Valve & Regulator Co. v. Iranian Oil Services, Ltd.,* 87 F.R.D. 93, 96 (S.D.N.Y.1980), we know of no court to actually apply this theory. Nor are we inclined to, largely because we do not accept the application of the agency theory in reverse.

Courts which exercise jurisdiction over a principal by virtue of an agent's acts typically justify their decision by noting that, were it not for those acts, the principal would have acted himself. *Gelfand v. Tanner Motor Co.,* 385 F.2d 116 (2d Cir. 1967). However, the rationale makes little sense in reverse. While an agent functions at the principal's behest, the principal exists independent of the agent. It is difficult to see how an agent with no control over its principal can be held accountable for the principal's actions. We thus agree with Judge Weinfeld who stated in *Grove Valve & Regulator Co. v. Iranian Oil Services, Ltd., supra:* "While it is possible to find jurisdiction over a principal based on the acts in New York of its agent, ... this theory of jurisdiction is completely inapposite here where it is the alleged principal who does business in New York and the agent who does not." *Id.* at 96.

Moreover, the record is devoid of evidence sufficient to make out a *prima facie* case that either DH&S (Aus.) or Yarwood Vane was an agent of DH&S (U.S.) in this or any other matter. Throughout its relationship with the DH&S International, the Australian firm has maintained control of its day-to-day operations. It chooses its own Australian clients, and its dealings with those clients—one of whom was Ferrovanadium—are entirely autonomous. While the Australian firm shares referral fees with other DH&S firms, it does not share profits or losses with those firms. Indeed, the referral arrangements are mutually beneficial. A wholly owned subsidiary that continues to control its day-to-day operations cannot be an "agent" for jurisdictional purposes. *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175 (9th Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980). It follows that a firm that maintains control of its profits and losses and of its day-to-day operations cannot be generally labelled an agent for jurisdictional purposes. Nor, does the record indicate that Yarwood Vane was the United States firm's agent with regard to Ferrovanadium's 1979 audit or securities filing. Neither DH&S (Aus.) nor Yarwood Vane was ever the United States firm's agent.

Absent an agency theory, a court may not ascribe DH&S (U.S.)'s actions to Yarwood Vane or DH&S (Aus.) unless the latter is shown to be a mere department or agency of the former.[9] *Bialek v. Racal-Milgo, Inc.,* 545 F.Supp. 25, 31–32 (S.D.N.Y.1982); *Blount v. Peerless Chemicals (P.R.) Inc.,* 216 F.Supp. 612, 615 (E.D.N.Y. 1962), *aff'd,* 316 F.2d 695 (2d Cir.), *cert. denied,* 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963). A subsidiary relationship or common stock ownership is a threshold minimum to such a finding. *Grove Valve & Regulator Co., supra,* 87 F.R.D. at 95. The exhibits before the Court rebut any allegation that Yarwood Vane was a DH&S (U.S.) subsidiary, that the two were owned in common, or that one

---

**9.** The complaint alleges that because DH & S (U.S.) and Yarwood Vane had merged the two were a single entity. Under those circumstances, one might consider Yarwood Vane a mere department of DH & S (U.S.). The American firm's acts would then be attributable to the Australian partnership. In light of the affidavits accompanying the defendants' motions to dismiss and of the partnership agreements produced during discovery, the merger assertion is no longer viable.

was a department or agency of the other.[10] Given the courts' hesitancy to characterize one firm as another's alter ego for jurisdictional purposes, *Walker v. Newgent*, 583 F.2d 163 (5th Cir.1978) ("A subsidiary corporation will not be regarded as the alter ego of its parent because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of control that stock ownership gives to stockholders.") (quoting *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573 (Tex.1975)), it would defy logic to pin such a label on Yarwood Vane.

▇ The 1979 agreement established a cooperative venture between independent economic entities. By signing that agreement, Yarwood Vane could not have expected to submit itself to the jurisdiction of the United States courts. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) (The defendant must perform some act by which it purposefully avails itself of the privilege of conducting activities within the forum.). To find that agreement sufficient to support the exercise of personal jurisdiction over Yarwood Vane would be to disregard notions of fair play and substantial justice.

### 2. *Doing An Act in the Forum: Restatement § 36*

▇ The plaintiff also argues that the Australian firm's United States contacts, absent those of its United States affiliate, justify asserting personal jurisdiction over Yarwood Vane and DH&S (Aus.). According to the plaintiff, both Yarwood Vane and DH&S (Aus.) did "an act in the state with respect to a cause of action in tort arising from the act" thereby satisfying the test of Restatement § 36.[11]

Contrary to the plaintiff's assertion, section 36 provides no basis for exercising jurisdiction over Yarwood Vane. The plaintiff cites seven separate communications between Yarwood Vane and the DH&S (U.S.) offices as support for its assertion. However, the causes of action alleged herein against Yarwood Vane did not arise out of the referenced communications. The 1979 telexes and telephone calls between the Australian and United States affiliates constituted attempts to correct Ferrovanadium's filing and to limit the adverse impact of that filing. The cause of action arose from the 1979 audit's noncompliance with GAAP. Yarwood Vane conducted the audit in Australia. Any tort committed by Yarwood Vane arose out of acts it took or refused to take in Australia.

Nor did the 1980 communications with the Denver and Los Angeles offices give rise to a cause of action against DH&S (Aus.). That cause of action allegedly arose from Yarwood Vane's failure to issue its 1980 audit in compliance with GAAP. The 1980 communications with the Denver and Los Angeles offices in no way related to the manner of presentation of the 1980 audit. Thus, this Court cannot exercise personal jurisdiction over Yarwood Vane or DH&S (Aus.) under section 36.

### 3. *Doing An Act Out of the Forum: Restatement § 37*

▇ The plaintiff also attempts to ground jurisdiction over Yarwood Vane and

---

**10.** The plaintiff finds support for his attribution theories in brochures and pamphlets describing DH & S (U.S.) in terms such as "a single cohesive worldwide organization," Affidavit in Support of Plaintiff's Supplemental Memorandum, Exhibit 20, and in communications between the U.S. and Australian affiliates referring to the international organization as "the firm." Such references cannot alone contradict the plain meaning of the above-described international agreements. *See American Trading and Production Corp. v. Fishbach and Moore, Inc.*, 311 F.Supp. 412, 416 (N.D.Ill.1970) ("[T]he Parent's boastful advertising [does not] show in any way that corporate identities were otherwise ignored by the participants in the conduct of the enterprises.").

**11.** Restatement § 36(1) provides in full:

(1) A state has power to exercise judicial jurisdiction over an individual who has done, or has caused to be done, an act in the state with respect to any cause of action in tort arising from the act.

*Restatement (Second) of Conflict of Laws,* § 36 (1971).

DH&S (Aus.) on section 37 of the Restatement. That section reads:

A state has the power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state makes the exercise of such jurisdiction unreasonable.

*Restatement (Second) of Conflicts of Laws* § 37 (1971). Section 37 "must be applied with caution, particularly in the international context." *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972). A court should only exercise jurisdiction over a party under section 37 if "[t]he person sought to be charged ... know[s] or ha[s] good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Id.*

The plaintiff believes three of the Australian firm's extraterritorial acts support the exercise of jurisdiction: (1) the signing of the 1979 audit, (2) the signing of the 1980 Ferrovanadium audits, and (3) the failure to correct or disclose the 1979 audit's alleged misrepresentations and omissions. Only the 1980 audit constituted an act sufficient to support the exercise of personal jurisdiction.[12]

#### a. *The 1979 Audit*

■ The plaintiff asserts that when Yarwood Vane signed the 1979 audit it performed an act outside of the forum "causing effects in the forum." *Restatement (Second) of Conflict of Laws* § 37 (1971). The plaintiff argues that since Yarwood Vane knew Ferrovanadium would include the audit in a United States securities filing, we can reasonably exercise jurisdiction on the basis of that audit. The available evidence, however, does not establish *prima facie* that Yarwood Vane knew at the time it signed the 1979 audit that Ferrovanadium would incorporate that audit in a United States securities filing. Absent such knowledge, we cannot reasonably ground jurisdiction over Yarwood Vane on the 1979 audit.

#### 1) *Facts*

On August 2, 1979, while work on the 1979 audit was in progress, Devenish received Ferrovanadium's July 31, 1979, letter relaying its intention to register securities. The letter

"inquired whether audited accounts prepared in Australia for Australian shareholders would suffice for the filing, or, if not, the most convenient means of complying with United States requirements, and asked for written consent to use of Yarwood Vane's report in the registration statement. The Company asked that its unaudited accounts be forwarded to the Los Angeles office of the United States firm of Deloitte Haskins & Sells ("DH&S (U.S.)") to obtain their advice, and suggested that Mr. Leo Bromberg, "Attorney at Law" and the Company's "agent" in Los Angeles, might be of assistance to DH&S (U.S.)."

Notice of Motion, Devenish Affidavit ¶ 8.

On August 2, 1979, Devenish forwarded the inquiry to the DH&S (U.S.) Los Angeles office. Devenish also telexed the Los Angeles office to express some doubts about the company, their reasons for registering securities, and Bromberg. On August 8, Thomas Shephard of the DH&S Los Angeles office wired Devenish. The wire stated, "We have an understanding with [Bromberg] that we will confine our assistance to matters regarding the financial statement and relevant United States accounting and auditing standards relating to this somewhat unique SEC filing ...." Affidavit in Support of Plaintiff's Supplemental Memorandum, Exhibit 5. Shephard then referred the matter to the DH&S

---

**12.** We predicate this exercise of personal jurisdiction on the disputed contention that DH & S (Aus.) knew or should have known that Ferrovanadium would incorporate its 1980 audit in a United States securities filing. Eventually, the plaintiff will have to prove this contention by a preponderance of the evidence. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981).

(U.S.) New York office. On August 14, 1979 Yarwood Vane signed and delivered a copy of the 1979 audit to the company's offices in Perth. On August 16, the New York partners in charge of the matter, Kenneth Allen and Edward Darcey, telexed Devenish detailing the steps Yarwood Vane would have to take before the Ferrovanadium audit could be included in an SEC filing. Darcey and Allen agreed to assist with the proposed registration statement. They also suggested that Devenish resolve his reservations about the commercial morality of Ferrovanadium's directors before Yarwood Vane or DH&S further involved themselves in the securities filing. On the same day, Leo Bromberg telephoned Shephard and informed him that he had filed the Form 10 with the SEC. Five days later, Devenish learned from Darcey and Allen that they had received a copy of the Form 10.

### 2) Discussion

The August correspondence record indicates an understanding between Yarwood Vane and DH&S (U.S.) that the two would work together to bring the Ferrovanadium audit into compliance with SEC standards. In fact, the correspondence indicates that both firms hesitated to assume that responsibility. The plaintiff has not established that Yarwood Vane ever consented to Ferrovanadium's filing the 1979 audit with the SEC. Indeed, the plaintiff has presented no evidence to convince the Court that the August 16 filing came as anything but a surprise to Yarwood Vane. Thus, the plaintiff's numerous assertions that Yarwood Vane knew the 1979 audit would be used with the registration find no support in the record.

No doubt, Yarwood Vane might have foreseen that Ferrovanadium would incorporate the original financial statement in an SEC filing. However, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Calder v. Jones, supra*, 104 S.Ct. at 1487; *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 295, 100 S.Ct. at 566. Since Yar-

wood Vane did not "know, or have good reason to know that [its] conduct [would] have effects" in the United States, *see Leasco, supra*, 468 F.2d at 1341, it could not have reasonably anticipated being haled into this forum. *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 297, 100 S.Ct. at 567. In addition, Ferrovanadium's unilateral act of filing the Australian audit, without Yarwood Vane's consent or knowledge, cannot alone satisfy the requirements of due process. *Id.* at 296, 100 S.Ct. at 566 (The "mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state.'") (quoting *Hanson v. Denckla, supra*, 357 U.S. at 253, 78 S.Ct. at 1239–40).

### b. *The Failure to Correct the 1979 Audit*

■ The Court might also premise jurisdiction over Yarwood Vane on the theory that the Australian accountants committed an act outside of the United States causing effects therein (*see* Restatement § 37) when they breached a duty to disclose the 1979 audit's noncompliance with GAAP. This argument assumes that, at some time after trading in Ferrovanadium ADRs commenced, Yarwood Vane knew or should have known that the 1979 audit was on file with the SEC. While the plaintiff has established *prima facie* that Yarwood Vane had such knowledge, we cannot find that Yarwood Vane had a duty to disclose or to warn investors of the discrepancy between the Australian and American accounting standards. Given the absence of such a duty, we conclude that the plaintiff did not by omission commit an act conferring jurisdiction on this Court.

The plaintiff's affidavits support the inference that, as of January 1980 (when trading in Ferrovanadium securities commenced), DH&S (Aus.) knew that the 1979 audit was on file with the SEC. A brief review of the facts supports this conclusion.

Ferrovanadium's July 31 letter informing Yarwood Vane of its intention to register securities with the SEC states, "The Com-

pany has set a target date of 31st October, 1979, for listing the Company in the United States which includes an S.E.C. imposed cooling off period of 60 days." Affidavit in Support of Plaintiff's Supplemental Memorandum, Exhibit 2. Upon receiving this letter, Yarwood Vane should have been aware that the Form 10 filed August 16 would automatically become effective 60 days after filing. Devenish's testimony at his September 18, 1981, deposition supports this inference. Devenish was asked, "At the time of the audit ... of the 1980 financial statements you had already been told by the ... people in the United States that it was their opinion that the registration by Ferrovanadium in the United States was effective despite the irregularities—correct?" "Yes," Devenish replied. Berger Affidavit, Exhibit 1, at 300. Devenish was also asked if, in April, 1980, he had been told by the New York DH&S partners that the registration had not been accepted. He replied, "No, their feeling was that the registration is accepted despite irregularities and that those irregularities may come to light later on." *Id.* at 298–99.

Materials gleaned from DH&S (Aus.)'s 1980 Ferrovanadium audit file indicate that DH&S (Aus.) was aware of continued United States trading in Ferrovanadium securities. Newspaper articles in that file refer to over-the-counter trading in Ferrovanadi-

um securities. And a financial report in the same file stated, "Please note that shares in Ferrovanadium Corporation N.L. were admitted on American Depository Receipt (ADR) basis as of 21st December, 1979." Affidavit in Support of Plaintiff's Supplemental Memorandum, Exhibit 18. The Court finds the above-described evidence sufficient to establish that throughout the fall of 1979 and the first eight months of 1980, Yarwood Vane—later DH&S (Aus.)—knew its 1979 audit was part of an active SEC filing. The plaintiff's *prima facie* showing suffices notwithstanding the defendant's presentation of evidence to the contrary.[13] *Marine Midland Bank, N.A. v. Miller, supra,* 664 F.2d at 904.

Having established knowledge, the plaintiff next asserts that once Yarwood Vane knew its accounting statements were on file with the SEC, there arose a duty to take steps to correct, restate, or prevent the dissemination of its allegedly misleading auditor's report. He argues that Yarwood Vane and later DH&S (Aus.) breached this duty thereby committing a tortious act causing effects in the United States sufficient to justify the exercise of jurisdiction.[14] Restatement § 37.

The plaintiff premises his argument that a duty existed on a line of cases beginning

---

13. Yarwood Vane and its successor flatly deny ever having had such knowledge prior to February 1981. In his January 12, 1983, affidavit, Devenish stated that, in late 1979, John Stringfellow, Secretary of Ferrovanadium, informed him that Ferrovanadium's attempt at registration had terminated. Devenish also claimed to have "understood [in late March 1980] that Ferrovanadium had discontinued its registration...." Devenish Affidavit at ¶ 19. A June 20, 1980, memorandum from Devenish to the Los Angeles office recites: "As events turned out, the Company [Ferrovanadium] did not go ahead with the listing." Affidavit in Support of Plaintiff's Supplemental Memorandum, Exhibit 15. Although the ambiguous and contradictory evidence is by no means conclusive, we believe the plaintiff has provided affidavits sufficient to support an inference that DH & S (U.S.) knew as of October 16, 1979, when the Ferrovanadium Form 10 filing became effective, that its 1979 audit was on file with the S.E.C..

14. Yarwood Vane omitted to take even minimal steps to prevent use of the financial statements and auditor's report thereon in the United States, steps as simple as sending a letter or a telegram to the S.E.C. It did not inform the S.E.C. that its auditor's report was being used without consent; it did not notify the S.E.C. that the financial statements and its report thereon did not satisfy United States disclosure requirements; it did not attempt to influence Ferrovanadium's conduct by resigning, or so far as appears, by taking any other action. In a real sense, then, even if it did not consent, Yarwood Vane surely permitted the use of the financial statements and its report thereon. The failure to take steps to prevent the use of the auditor's report, and the failure to negate the effects of its filing with the S.E.C., in itself amounts to conduct which had an effect in the United States.

Memorandum of Plaintiff in Opposition to Defendants' Motions to Dismiss and Defendant Bromberg's Motion to Transfer at 35–36.

with *Fischer v. Kletz*, 266 F.Supp. 180 (S.D. N.Y.1967). In *Fischer*, defendant accountants issued certified financial reports for release in an annual report to stockholders. While conducting studies for their audit client, the defendants discovered that the financial statements were false and misleading. The court held that the accountants had a duty to disclose the information they had uncovered. Several courts have followed *Fischer* and held that accountants have a duty to correct or restate financial statements when, subsequent to an audit, they discover facts that reveal inaccuracies or distortions in the original financial statement. *See IIT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 927 (2d Cir.1980); *United States v. Natelli*, 527 F.2d 311 (2d Cir.1975); *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). (In a criminal case, defendant had a duty to disclose substantial writeoffs which postdated financial statements); *In re Davy*, [1983–84] Fed.Sec.L.Rep. (CCH) ¶ 83,482 (SEC Jan. 25, 1984) (SEC imposed sanctions on accountants for failing to disclose inaccuracies brought to their attention subsequent to the filing of an annual financial statement.). The plaintiff argues that according to these cases, Yarwood Vane, and later DH&S (Aus.), had a duty to correct or restate the 1979 audit.

In countering this argument, the defendants cite decisions which hold that an accountant has no duty to disclose the information that would bring an audit into compliance with changed accounting standards. A representative case is *Hirsch v. DuPont*, 553 F.2d 750, 761 (2d Cir.1977). In that case, defendant accountants issued their annual audit in compliance with GAAP. Two months after defendant accountants completed their audit, the New York Stock Exchange revised its accounting rules regarding net capital accounts of brokerage firms. The court held that the defendants had no duty to disclose that they had not issued the financial statements in accordance with the revised rules. A recent district court opinion came to a similar conclu-

sion. In that case, *In re North American Acceptance Corp. Securities Cases*, 513 F.Supp. 608 (N.D.Ga.1981), the court observed:

> The subsequent event which plaintiffs deem pertinent is the alteration of a method of accounting by the AICPA, not a new fact with respect to NAAC's financial condition in August 1972 not known to Touche Ross at the time of the issuance of the opinion. Consequently, the Court finds plaintiffs' claims against Touche Ross to be most similar to those found in [*Hirsch v. du Pont*, 553 F.2d 750 (2d Cir.1977) ] and in *Ingenito v. Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y. 1977) ... wherein the court held that the mere possession of adverse financial information does not require an independent auditor to disclose it even if the auditor previously has certified figures for a prior period, so long as the certified statement is still accurate *as of the date of its issuance.* 441 F.Supp. 525 (emphasis in original).

*Id.* at 636.

We find the Ferrovanadium situation analogous to the one in which changed accounting standards render a financial statement inaccurate. The 1979 Ferrovanadium audit was accurate in Australia when issued and remains accurate. Thus, this case differs fundamentally from those in which an accountant, subsequent to filing its audit, becomes aware of new facts rendering its prior report inaccurate. Rather, the plaintiff alleges that Yarwood Vane had a duty to disclose the variation between its 1979 audit and an audit that would have complied with United States GAAP. Since Yarwood Vane would have no duty under American law to accord a single representation in its audit with a new accounting standard, so too Yarwood Vane had no duty to bring its entire audit into compliance with the United States standards or to disclose any noncompliance.[15]

---

**15.** In support of its duty argument, the plaintiff points to several post-August 16 communica-

tions between the U.S. and Australian firms, one of which confirms an understanding that De-

We, therefore, conclude that no duty arises when a foreign accountant, like Yarwood Vance, renders a report complying with local accounting standards and subsequently learns that his client has included the report in a United States securities filing.

The plaintiff also premises the existence of a duty on portions of the Australian and American professional standards of conduct for the accounting profession. The plaintiff cites section 561 of the American Institute of Certified Public Accountants, Codification of Statements on Auditing Standards. This section outlines procedures an auditor should follow when he becomes aware, "subsequent to the date of his report upon audited financial statements ... that facts may have existed at that date which might have effected [sic] his report had he then been aware of such facts." American Institute of Certified Public Accountants, Codification of Statements on Auditing Standards, AU § 561 (1977). Section 561 concerns only changed facts, not changed reporting requirements. The plaintiff also attempts to derive a duty from Ethical Ruling 6 of the Institute of Chartered Accountants in Australia. This ruling prohibits an entity, in certain circumstances, from allowing its name to appear as an auditor in any prospectus. Yarwood Vane did not permit Ferrovanadium to use its 1979 audit in a securities filing. Instead, Ferrovanadium filed that statement without Yarwood Vane's consent. Thus, neither AER 6 nor section 561 provides a predicate to the exercise of jurisdiction over Yarwood Vane or DH&S (Aus.). Since they had no duty to disclose the 1979 audit's non-compliance with United States accounting standards, we cannot exercise jurisdiction over them on the ground that they allegedly breached such a duty.[16]

#### c. *The 1980 Audit*

If a party performs an act that he knows or has good reason to know will have effects in the forum, and if the exercise of jurisdiction by that forum is not unreasonable, then personal jurisdiction will lie with respect to that act. *Lease Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1341. The plaintiffs have provided evidence sufficient to establish *prima facie* that DH & S (Aus.) knew or should have known on November 12, 1980, when it signed and issued the 1980 Ferrovanadium audit, that the audit would be incorporated in an annual report and in a United States securities filing. The exercise of jurisdiction over DH & S (Aus.) on the basis of this act is reasonable. By issuing the 1980 audit, the Australian accountants subjected themselves to this Court's jurisdiction for causes of action arising out of that audit.

As noted previously, *see supra* pp. 1256–1258, we believe the affidavits and deposition testimony provided the Court could support the conclusion that, throughout 1980, DH & S (Aus.) knew that Ferrovanadium ADRs were trading in the United States and that the 1979 Ferrovanadium

venish would take some limited steps to remedy the improper filing. We do not believe this or any of the other communications bears on the presence or absence of a duty to correct the U.S. filing.

**16.** In addition, we hesitate to premise the exercise of jurisdiction on a failure to act. In this regard, we are mindful of two recent circuit court opinions, *Carty v. Beech Aircraft Corp.,* 679 F.2d 1051 (3d Cir.1982), and *Chlebda v. H.E. Fortna and Brother, Inc.,* 609 F.2d 1022 (1st Cir.1979). In these product liability opinions, the First and Third Circuits held that a non-resident defendant's failure to act did not constitute an act or omission within the meaning of the Virgin Islands and Massachusetts long arm statutes. In *Chlebda,* the court asked rhetorically, "[can] an omission, *viz.,* a failure to act, ... be thought to furnish the minimum contact with that state that is needed to confer jurisdiction? It seems clear that it could not be. The whole thrust of plaintiff's claim is that there was no contact at all," *Id.* at 1023–24. No doubt, this case differs from *Chlebda.* There, the court applied a long arm statute; we may assert jurisdiction to the limits of due process. Nevertheless, the concerns that motivated the First and Third Circuits also caution us against asserting jurisdiction on the basis of inaction. Unnecessarily recognizing inaction as a jurisdictionally significant contact might pressure foreign firms to limit their contacts with the United States and thereby impede international commerce.

audit was part of an active registration statement upon which United States shareholders and investors would rely. Indeed, the 1980 audit file contains much of the supporting evidence. In addition, DH & S (Aus.) knew or should have known of the SEC's annual filing requirements which mandate the annual filing of a Form 10–K, including a company's audited financial statements.[17] A memorandum dated March 31, 1980, from Robert Devenish to the DH & S (U.S.) executive office provides *prima facie* support for this assertion. In that memorandum, Devenish states:

> I spoke to a representative of the company recently and asked what action would be taken with respect to future filing of financial statements with the S.E.C. The matter had not been considered.

> It seems we may well find ourselves again in the position of having our Australian audit report on statements filed in the U.S. and those statements may not comply with S.E.C. requirements. I am not knowledgeable on S.E.C. filing requirements but I assume there is some annual requirement.

Affidavit in Support of Plaintiffs' Supplemental Memorandum, Exhibit 16.

We may also infer that DH & S (Aus.) knew Ferrovanadium would include the 1980 audit in its 1980 annual report. Ferrovanadium had issued an annual report in 1979 and, presumably, in prior years as well. That report included its audited financial statement. The issuance of a similar report in 1980 should have come as no surprise. Since DH & S (Aus.) knew Ferrovanadium securities were trading in the United States, it should also have known that Ferrovanadium's shareholders and other United States investors would rely on a Ferrovanadium annual report.

Of course, Restatement § 37 also requires the plaintiff to establish that the alleged cause of action arose from the effects of issuing the 1980 audit. The plaintiff alleges that the 1980 audit misled the public and distorted the market in Ferrovanadium securities. This misrepresentation arose directly from the dissemination of the allegedly misleading 1980 audit.

Finally, Restatement § 37 limits the exercise of jurisdiction, based on an extraterritorial act whose effects gives rise to a cause of action, to situations where the exercise of such jurisdiction is reasonable. None of the circumstances connected with this case make the exercise of jurisdiction unreasonable. In fact, the available evidence indicates that DH & S (Aus.) could reasonably have expected to be haled into court to answer for statements contained in the 1980 audit report. *See World Wide Volkswagen v. Woodson, supra,* 444 U.S. at 297, 100 S.Ct. at 567. When Devenish learned of the 1979 Form 10 filing, he requested that the DH & S (U.S.) office "advise [him] if the firm has any exposure at the present time." Affidavit in Support of Plaintiff's Supplemental Memorandum, Exhibit 10. Given his concern, Devenish should not have been surprised by the 1980 audit or by the subsequent lawsuit. DH & S (Aus.)'s other contacts with the United States, including its membership in the DH & S International headquartered in New York, its previous correspondence concerning the 1979 audit, and its 1980 work in conjunction with the Denver office, although not of themselves sufficient to justify the exercise of jurisdiction, further support the reasonableness of exercising jurisdiction in this context. In addition, the significant interest of the United States in redressing and preventing violations of its securities laws, particularly when these violations, as here, allegedly harm United States investors through representations in United States securities filings further supports the reasonableness of exercising jurisdiction over DH & S (Aus.).

That Ferrovanadium actually issued the annual report and filed the Form 10–K with the SEC is of no import. The Court does not exercise jurisdiction solely on the basis

---

**17.** The pertinent provision requires the filing of an annual report for each year after the last full fiscal year for which financial statements were filed in the application for registration. Rule 13a–15, Form 10–K, Gen.Inst.A.

of "the mere unilateral activity of those who claim some relationship with a nonresident defendant," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), but, rather, on the basis of effects in the forum which DH & S (Aus.) knew would occur. We therefore believe the 1980 audit provides an adequate basis on which to reasonably exercise jurisdiction over DH & S (Aus.).

A recent decision from the Eastern District of New York supports our holding with regard to the 1980 audit. In *Eltman v. Grandma Lee's Inc.*, No. 82 Civ. 1912, (E.D.N.Y. August 15, 1983), that court held a Canadian accounting firm subject to the personal jurisdiction of the United States courts under section 27. In that case, defendant Kendall, a Canadian chartered accounting firm, performed all of the accounting services for its Canadian client in Canada. The client then registered its securities in the United States. The registration became the subject of a lawsuit. The court inferred from evidence in Kendall's audit file similar to evidence in DH & S (Aus.)'s file "that Kendall should have been aware that its financial audits would be relied upon by a substantial number of American investors." "Such a finding," it concluded, "would support the exercise of personal jurisdiction over Kendall." *Id.* at 6. We agree.

Although we find that this Court may exercise personal jurisdiction over DH & S (Aus.), we also hold that our jurisdiction is limited to claims arising from the November 1980 audit and its effects in the forum. Restatement § 27, upon which we rest the exercise of jurisdiction, permits a forum to exercise jurisdiction with respect to any cause of action arising from the effects of an out-of-forum act. Ferrovanadium filed its 1980 annual report, which contained DH & S (Aus.)'s 1980 audit, sometime after November 12, 1980.[18] The Form 10–K was filed on or about January 21, 1981. Thus, we can only subject DH & S (Aus.) to this Court's personal jurisdiction for claims commencing after the dissemination of the 1980 annual report in November 1980, and arising out of that audit.

B. *Motion to Dismiss for Failure to State a Claim on Which Relief Can be Granted*

1. *Introduction*

The defendants also move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief can be granted. Both parties buttressed their arguments on this motion with documents, affidavits, and other materials outside the pleadings. We therefore treat this as a motion for summary judgment pursuant to Fed.R.Civ.P. 56. We may grant summary judgment only if the memoranda and supporting materials before us "disclose that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725 (2d ed. 1983) (*quoting,* Fed.R.Civ.P. 56(c)).

An actionable claim of primary violation under section 10(b) of the Securities Act and Rule 10b–5 thereunder consists of three elements: a material misrepresentation or omission, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); a causal relationship between the alleged violation and the resultant injury, *id.* at 154, 92 S.Ct. at 1472; and scienter—an intent on the defendant's part to deceive, manipulate, or defraud the plaintiff. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–97, 96 S.Ct. 1375, 1381–83, 47 L.Ed.2d 668 (1976). Defendant accountants move to dismiss the complaint for failure to adequately allege two of these elements: a material misrepresentation or omission and causation. Defendant Bromberg also moves to dismiss on the latter ground. We believe there exist

---

**18.** The complaint states that Ferrovanadium disseminated its 1980 annual report on or about November 11, 1980. That annual report contains an audit dated November 12, 1980. Thus, common sense leads us to believe that Ferrovanadium disseminated the report sometime after November 12. The plaintiff will eventually have to specify the date of dissemination.

genuine issues of material fact on both the scienter and misrepresentation issues. We therefore decline to grant either defendant's motion.

### 2. *Failure to Allege a Material Misrepresentation or Omission*

■ Defendant DH & S (Aus.) asserts that the 1980 Ferrovanadium audit contained no material misrepresentation or omission.[19] Both sides agree that the essence of the plaintiff's complaint is that the Australian auditors failed to disclose the 1980 audit's lack of conformity with GAAP. DH & S (Aus.) argues that the audit indicates on its face its noncompliance with the GAAP and thereby denies the existence of an omission. The defendant asserts that the following statement contained in the 1980 auditor's report supports its argument:

> . In our opinion ... the balance sheet, profit and loss account and accompanying notes of Ferrovanadium Corporation N.L. and group accounts, being the consolidated balance sheet, consolidated profit and loss account and notes of the company and its subsidiary, are properly drawn up in accordance with the provisions of the Companies Act, 1961, and so as to give a true and fair view of: 1. The state of affairs of the company and of the group as at 30th June, 1980 and the loss of the company for the year ended on that date ... and 2. The other matters required by Section 162 of that Act to be dealt with in the accounts and in the group accounts.

Defendant's Supporting Memorandum of Law, Document 1 at 15. The international accounting expert might well infer conformity with American accounting standards from this statement. On the other hand, this statement could be read to express no opinion on the conformity of the 1980 audit with United States GAAP. Since the 1980 audit does not clearly disaffirm the audit's compliance with GAAP, we

find that the plaintiff has properly alleged an omission upon which a Rule 10b–5 claim for relief can be based. Whether this paragraph expressly disclaims any reliance on United States accounting standards is a question for the fact-finder.

■ The materiality of the alleged omission is also a question for the fact-finder.

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does, the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate, a determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*T.S.C. Industries, Inc. v. Northway*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976) (citations omitted). The complaint makes clear that Australian and United States accounting standards differ. The plaintiff alleges that the 1980 audit misstated Ferrovanadium assets, equity, and revenues. We are unable to conclude that " 'reasonable minds cannot differ on the question of materiality.' " *Id.* We therefore leave that question to the fact-finder.

### 3. *Causation*

Defendants DH & S (Aus.) and Leo Bromberg also move to dismiss the com-

---

**19.** Given our disposition of the personal jurisdiction issue, we need not address the allega-

tions in the complaint respecting the 1979 audit.

plaint for failure to allege the requisite causal connection between the plaintiff's injury and the alleged securities law violation. The defendants argue that the plaintiff's reliance on the "fraud-on-the-market" theory of causation is misplaced. According to the defendants, that theory applies only to so-called *efficient* securities markets. We agree with the defendants on that point. Nevertheless, we decline to dismiss the plaintiff's claim on causation grounds.

The "fraud-on-the-market" theory is a judicially fashioned exception to the traditional requirement that the plaintiff actually rely on the defendant's deception. *See generally* Note, *The Fraud-on-the Market Theory*, 95 Harv.L.Rev. 1143, 1143–46 (1982) ("Note"). Courts in this circuit, like those in the Fifth and Ninth Circuits, accept this theory. *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir.1982), *vacated as moot*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 554 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Rifkin v. Crow*, 574 F.2d 256, 263 (5th Cir.1978); *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Koenig v. Smith*, 88 F.R.D. 604, 607 (E.D.N.Y.1980). Under the theory, a plaintiff may establish a rebuttable presumption of reliance by alleging that an affirmative misrepresentation or an omission [20] affected the price of a security traded on an open market. *Panzirer v. Wolf, supra*, 663 F.2d at 368. The defendant may rebut the presumption by showing that the material misrepresentation or omission did not substantially contribute to

the plaintiff's investment decision. *Id.* at 367; Note, *supra*, at 1150–52.

The defendants argue that the fraud-on-the-market theory cannot apply in this case. They assert that the theory only applies to securities traded in "efficient markets" and that, since Ferrovanadium securities never traded on such a market, the fraud on the market theory is inapplicable. The plaintiff counters by asserting that the "fraud-on-the-market" theory exists apart from any theory about efficient or inefficient markets. He contends that the theory simply incorporates a special solicitude for those injured in the securities markets. In the plaintiff's view, "Once materiality of the false statement or omission is proven, causation is established by proof of reliance on the integrity of the market." Plaintiff's Memorandum of Law in Opposition at 54. The defendants have the better argument.

While a desire to encourage vigorous enforcement of the securities laws may encourage courts to establish a presumption of reliance, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 374 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973), courts will presume reliance only when it is logical to do so. *See Lewis v. McGraw*, 619 F.2d 192, 198 (2d Cir.), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980) (Cases presuming reliance under section 14(e) of the Williams Act did not "abolish it as an element of the cause of action. Rather, they held that in cases in which reliance is possible, and even likely, but is unduly burdensome to prove, the resulting doubt would be resolved in favor of the class the

---

**20.** Although originally developed in the context of affirmative misrepresentations, *see e.g., Green v. Wolf Corp.*, 406 F.2d 291, 295 (2d Cir.1969) (deceptive prospectuses were distributed in the financial community), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *In re Memorex Securities Cases*, 61 F.R.D. 88, 100–01 (N.D.Cal.1973) (issuer materially misrepresented its financial status), the "fraud-on-the-market" theory now applies to omissions as well. *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir.1981) ("Just as a material misrepresentation *or omission* is presumed to affect the price of the

stock....") (emphasis added); *Schlanger v. Four-Phase Systems*, 555 F.Supp. 535 [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,147 at 95,534 (S.D.N.Y.1982) ("The Court believes that where ... the evidence at trial demonstrates with reasonable certainty that the fraudulent statements so permeated and polluted the market as to distort the price by distorting the decision-making process by which others determined to sell, damages may be recovered. A misleading omission stands on no different ground."). *See also Koenig v. Smith*, 88 F.R.D. 604, 607 (E.D.N.Y. 1980).

statute was designed to protect."); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra,* 480 F.2d at 375 (A presumption of reliance is established "where it is logical to presume that reliance in fact existed."). Such a logical presumption underlies the "fraud-on-the-market" theory.

In *Blackie v. Barrack, supra,* 524 F.2d at 907, the Ninth Circuit aptly set out the rationale for the theory:

> A purchaser on the stock exchange ... relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation.

*Id.* at 907. Thus, the theory assumes that the market is a transmission belt which efficiently translates all available information concerning a security into a price. *In re LTV Securities Litigation,* 88 F.R.D. 134, 144 (N.D.Tex.1980). In other words, it presumes the operation of an efficient market, a market in which "security prices reflect all available public information about the economy, about financial markets, and about the specific company involved." J. Van Horne, *Financial Management and Policy* 45 (4th ed. 1977); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 361–62 (2d Cir.1979) (defining the efficient market theory in similar terms).

By contrast with efficient markets, inefficient markets by definition do not translate all available information into the price. Note, *supra,* 95 Harv.L.Rev. at 1157. In such markets, the price of a security does not necessarily reflect all omissions and representations regarding that security. In this context, an inference of causation and reliance is inapposite. Thus, application of the "fraud-on-the-market" theory to inefficient markets would essentially eliminate causation as an element from some 10b–5 actions.

■ We are unwilling to read the causation requirement out of Rule 10b–5 private actions. Courts in this circuit have never been willing to take such a drastic step. *See List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) ("Assuredly, to abandon the requirement of reliance would be to facilitate outsiders' proof of insiders' fraud, and to that extent the interpretation for which plaintiff contends might advance the purposes of Rule 10b–5. But this strikes us as an inadequate reason for reading out of the rule so basic an element of tort law as the principle of causation in fact."). We therefore hold that the "fraud-on-the-market" theory will only apply where the market concerned is an efficient one.

■ The defendants argue that we should dismiss the plaintiff's claim because Ferrovanadium ADRs traded in an inefficient market.[21] The plaintiff, however, suggests that an active market existed in Ferrovanadium securities. He also provides some support for that suggestion. At this juncture, whether Ferrovanadium ADRs traded in an efficient market is unclear. Resolution of that issue must await further proof.

---

**21.** In his supporting memorandum of law, defendant Bromberg proffers considerable evidence to support his assertion that the market for Ferrovanadium ADRs was inefficient. In particular, Bromberg relies on recent SEC releases concerning a system for updating domestic and foreign securities registrations. Securities Act Release No. 6331, 46 Fed.Reg. 41902 (1982) (domestic issuers); Securities Act Release No. 6437, 47 Fed.Reg. 54764 (1982) (foreign issuers). These releases apparently attempt to delineate the scope of efficient markets. While they may prove helpful at a later stage, they do not alone conclusively support the defendant's claims regarding the market for Ferrovanadium securities.

**C.** *The Availability of An Implied Right of Action*

In his initial memorandum, Bromberg urged that the existence of an express remedy should negate the existence of an implied Rule 10b–5 action. In *Herman & Maclean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Supreme Court expressly rejected Bromberg's argument. There, the court held "that the availability of an express remedy under Section 11 of the 1933 Act does not preclude defrauded purchasers of registered securities from maintaining an action under Section 10(b) of the 1937 Act." *Id.* 103 S.Ct. at 690. In his papers, Bromberg contended that the express liability provisions in Sections 18 and 11(a) displace Rule 10b–5 actions. In light of the court's opinion in *Herman & Maclean v. Huddleston,* and previous Second Circuit decisions rejecting the general argument, *Ross v. A.H. Robins, supra,* 607 F.2d at 556, we hold that the plaintiff has an implied right of action regardless of the availability of an express remedy.

**D.** *The Plaintiff's Standing to Sue*

The defendant accounting firms also move to dismiss on grounds that the plaintiff lacks standing to base a claim on the Form 10–K. While we agree that the plaintiff lacks standing individually, we decline to decide whether he may represent the claim of class members who have standing to assert a claim regarding the Form 10–K.

As a general proposition, a securities purchaser lacks standing individually to maintain an action based on representations in or omissions from a document filed after his purchase. *Denny v. Barber,* 576 F.2d 465, 468–69 (2nd Cir.1978); *In Re Investors Funding Corp. of N.Y. Securities Litigation,* 523 F.Supp. 550, 557 (S.D. N.Y.1980). The plaintiff purchased 2000 Ferrovanadium ADRS on January 6, 1981.[22] Ferrovanadium filed the Form 10–K on January 21, 1981. Since the plaintiff could not have relied on a form filed subsequent to his purchase, he has no standing individually to sue the defendants with regard to that document.

The plaintiff argues that even if he lacks standing individually, he may, nevertheless, represent class members who purchased Ferrovanadium ADRs after January 21, 1981. Regardless of who has the better argument, we consider the dispute to go to the propriety of class certification. We believe the issue is properly viewed as a dispute about compliance with rules 23(a)(3) and (4) of the Federal Rules of Civil Procedure, which permit a party to represent a class only if "(3) the claims or defenses of the representative part[y] are typical of the claims or defenses of the class, and (4) the representative part[y] will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). *See In Re Investors Funding Corp. of N.Y. Securities Litigation, supra,* 523 F.Supp. at 557 ("Whether the issue is viewed in terms of standing or in terms of meeting the typicality requirement of a class representative, a plaintiff may not prosecute a case on behalf of a class of which he is not a member."). The parties have agreed to adjourn the plaintiff's motion for class certification pending the outcome of the various motions now before us. We will reconsider the standing issue if and when the plaintiff brings his motion for class certification. We decline to rule on that motion at this time.

**E.** *Motions to Dismiss for Failure to Plead Fraud with Particularity*

The defendants also move to dismiss, pursuant to Fed.R.Civ.P. 9(b), for failure to plead fraud with particularity. For the reasons stated below, we grant the defendants' motions.

**1.** *Background*

A complaint alleging fraudulent violations of Section 10(b) and Rule 10b–5

---

**22.** The complaint is silent as to the date of the plaintiff's purchase. However, a computerized list detailing plaintiff's purchase is appended to

Defendant's Memorandum in Support of the Rule 12(b)(2) Motion to Dismiss as Appendix A.

must satisfy the particularity requirement of Rule 9(b). *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). Therefore, mere conclusory allegations that the defendants' conduct was fraudulent are not enough. *Id.* at 114. Instead, the complaint must allege with some specificity the act or statements constituting the fraud. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). "[T]his means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 9.03, at 9–20 through 9–24 (1984) (footnote omitted). However, Fed.R.Civ.P. 8(a), which provides that the complaint should contain only "a short and plain statement of the claim," tempers Rule 9(b)'s particularity requirements. *See Credit & Finance Corp. v. Warner & Swasey Co.*, 638 F.2d 563, 566 (2d Cir.1981).

Rule 9(b) serves three aims. First, it gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests, thus enabling the defendant to prepare a defense. *Ross v. A.H. Robins Co.*, *supra*, 607 F.2d at 557. Second, it protects the defendant from harm to his reputation or goodwill that might result from charges of fraud. *Decker v. Massey-Ferguson, Ltd.*, *supra*, 681 F.2d at 114; *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972) (" 'It is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically.' ") (quoting 1A W. Barron & A. Holtzoff, *Federal Practice and Procedure* § 302, at 215–16 (Wright rev. 1960)). Third, it minimizes the number of strike suits. *Decker v. A.H. Robins Co.*, *supra*, 607 F.2d at 557. Thus, Rule 9(b) "inhibits the filing of a complaint as a pretext for discovery of unknown wrongs." *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1087 (S.D.N.Y.1977).

2. *Statement of Facts on Which Claim is Based*

In recognition of these policies, courts generally dismiss allegations of fraud based on information and belief. *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972). However, a fraud pleading that concerns matters peculiarly within the adverse party's knowledge will satisfy the 9(b) requirements if accompanied by a statement of facts upon which the belief is founded. *Id.* at 608; *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 n. 4 (S.D.N.Y.1981); *Gross v. Diversified Mortgage Investors*, *supra*, 431 F.Supp. at 1087; 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 9.03, at 9–26 through 9–27 (1984).

Except for one paragraph, the plaintiff bases his complaint on information and belief. When drafted, the complaint concerned matters within the defendants' knowledge. Thus, the complaint should have listed the facts upon which this belief was founded. By ignoring this requirement the plaintiff shirked Rule 9(b)'s requirements.

3. *Primary Claim Against Defendant DH & S (Aus.)*

Defendant DH & S (Aus.) first attacks the complaint under Rule 9(b) for failure to adequately plead scienter. In relevant part, the complaint alleges:

55. As part of its duties as Ferrovanadium's independent auditors, DH & S audited the books and records of Ferrovanadium, opined upon the false and fraudulent financial statements and consented to and permitted the use of its aforesaid opinions in subsequent reports and press releases to ADR holders and the investment community, SEC findings, and other publicly available documents ....

56. DH & S knew or in reckless disregard of the facts should have known that its opinion on the financial statements of

Ferrovanadium was materially false and misleading and would be relied upon by members of the public.

Complaint ¶ 55. The defendant argues that these pleadings do not adequately allege scienter. We agree.

 We agree with the defendant that the plaintiff should be required to plead the events that support its inference of knowledge. Defendant cites *Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir.1979), to support its argument. In *Robins*, the court considered a claim alleging a primary securities law violation under Rule 10b–5. It found inadequate the pleadings which asserted the plaintiff's knowledge of certain misrepresentations. The court then ordered "plaintiffs [to] specifically plead those events which they assert give rise to a strong inference that the defendants had knowledge of the facts contained in ... the complaint or recklessly disregarded their existence." *Id.* at 558. *See also Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769–70 (S.D.N.Y.1981), *aff'd without opinion*, 697 F.2d 296 (2nd Cir.1982). No doubt, the first and second sentences of Rule 9(b) create an ambiguity with regard to the requisite specificity of pleadings alleging scienter as part of a fraud claim. While "the first sentence requires that the complaint state with particularity the circumstances constituting the fraud," the second sentence requires only that "intent, knowledge and other conditions of mind ... be averred generally." *Cramer v. General Telephone & Electronics Corp.*, 582 F.2d 259, 272–73 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). Where, as here, the plaintiff has had an opportunity to discover considerable specific information, Rule 9(b)'s requirements with regard to allegations of scienter should be strictly construed. *Billard v. Rockwell International Corp.*, 683 F.2d

51, 57 (2d Cir.1982). The plaintiff should be held to the *Robins* standard and should plead those facts and events which he asserts give rise to an inference of scienter. The plaintiff *has not* alleged such facts.

 The plaintiff alleges that DH & S (Aus.) knew that its 1980 audit did not conform to United States GAAP and knew that its audit would mislead United States investors. Paragraph 55 of the complaint alleges that DH & S (Aus.) audited Ferrovanadium's books and permitted its audits to reach American investors.[23] The plaintiff could infer from DH & S (Aus.)'s role as auditor and its permission or consent to include the audit in United States filings that the Australian firm knew the 1980 audit would reach United States investors. However, the plaintiff nowhere supports its assertion that DH & S (Aus.) knew its audit would not comply with the SEC's filing requirements. Nor does the pleading state when DH & S (Aus.) became privy to such knowledge. We believe the complaint's failure to adequately plead scienter is grounds for dismissal of the complaint under Rule 9(b).

### 4. *Primary Claims Against Defendant Bromberg*

 Defendant Bromberg raises several challenges under Rule 9(b). He first argues that the plaintiff does not adequately allege Bromberg's scienter. We agree. The pleading does not set forth the facts and events giving rise to an inference of scienter as Rule 9(b) requires.

The complaint generally alleges Bromberg's knowledge or reckless disregard of the facts. (Complaint ¶ 61.) In addition, it specifies Bromberg's alleged role in Ferrovanadium's 1979 SEC filing. According to the complaint, Bromberg was

---

**23.** We base our determinations regarding the adequacy of the pleadings on the pleadings themselves. We note, however, that affidavits and evidence produced subsequent to the filing of the complaint do not support the plaintiff's assertion that DH & S (Aus.) consented to or permitted inclusion of the 1980 audit in U.S.

filings. *See* discussion *supra* at 33–35. Nevertheless, the evidence supports the inference that the defendant *knew* its audit would be included in such a manner. The plaintiff should amend its pleadings to comply with the evidence heretofore presented.

**1268**

Ferrovanadium's attorney and agent in the United States ... responsible for, amongst other things, assuring that Ferrovanadium's filings with the SEC and other regulatory agencies and dissemination of information to the investing public, complied with the requirements of these regulatory agencies including, but not limited to applicable disclosure requirements for annual reports to shareholders, periodic SEC filings and public relations material disseminated to the investing public.

Complaint ¶ 9. The complaint further alleges that

In May 1979 defendant Bromberg was retained as United States counsel and director of public relations for Ferrovanadium. As part of his responsibilities, he undertook to see that Ferrovanadium complied with the filing and disclosure requirements of public companies whose stock trades in the United States. Bromberg recommended that Ferrovanadium file pursuant to Section 12(g) of the Exchange Act under which Ferrovanadium was required to file the Form 10, Form S–12, the 1979 and 1980 Annual Reports and 1980 10–K.

Complaint ¶ 16.

These pleadings do not allege when and how Bromberg became aware that the documents he allegedly reviewed and/or filed did not comply with SEC standards. Since such noncompliance is the essence of the plaintiff's complaint with respect to Bromberg, the plaintiff has not adequately alleged Bromberg's scienter.[24]

■ Bromberg also attacks the pleading for failure to identify the acts for which he is liable. We believe the plaintiff's allegation that Bromberg "drafted and/or reviewed the aforesaid documents for compliance with filing and disclosure requirements" (Complaint ¶ 59) sufficiently particularizes Bromberg's role. Since the "aforesaid documents" include the 1979

and 1980 audit, the Form 10, the Form S–12 and the 1980 10–K, we assume this pleading asserts that Bromberg drafted or reviewed each of these documents. However, the allegation that "many of the materially false and misleading statements and omissions ... were authored by Bromberg" (Complaint ¶ 62) does not meet Rule 9(b)'s requirements. This pleading does not indicate which filings, or statements within those filings Bromberg authored. *Posner v. Coopers & Lybrand, supra,* 92 F.R.D. at 769. Unless the plaintiff can specify the misleading statements authored by Bromberg in each document, he cannot offer those statements as a basis for liability. *Decker v. Massey-Ferguson, supra,* 681 F.2d at 114. (The complaint must allege the acts constituting the fraud with some specificity.); *Posner v. Coopers & Lybrand, supra,* 92 F.R.D. at 769 (Complaint must allege, *inter alia,* "(1) precisely what statements were made, and (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) the same ....").

■ The plaintiff has also failed to allege "what [he] obtained or [gave] up as a consequence of [Bromberg's or the other defendants'] fraud." *Moore's Federal Practice, supra,* at 9–24. In particular, the plaintiff does not specify, *inter alia,* the price of the Ferrovanadium ADR's at the time of his purchase and sale. *See Posner v. Coopers & Lybrand, supra,* 92 F.R.D. at 769, *citing Skubik v. Leeds,* 1981 Fed.Sec. L.Rep. [CCH] ¶ 97,986 (S.D.N.Y.1981). The complaint fails in this regard as well.

Bromberg also attacks paragraph 60 of the complaint which reads: "Bromberg in a fraudulent, willful and reckless manner, failed to perform his duties for Ferrovanadium and failed to exercise the requisite professional responsibility required of him." Complaint ¶ 60. This pleading is so vague and conclusory as to be meaningless.

24. The evidence and affidavits produced subsequent to the filing of the complaint may indeed support the plaintiff's allegation of scienter. If so, the plaintiff should amend its complaint accordingly. Then, and only then, will defendant Bromberg receive adequate notice of the claims against him. *See Ross v. A.H. Robins Co., supra,* 607 F.2d at 557.

*Decker, supra,* 681 F.2d at 120. It adds nothing to the pleadings, and we construe it accordingly.

We also believe the plaintiff's allegation respecting Bromberg's duty to the ADR holders of Ferrovanadium and the investing public (Complaint ¶ 59) is sufficiently particular. Whether a duty existed is a question of law, not of pleading.

Finally, defendant Bromberg argues that his actions were those of a lawyer acting in a professional advisory capacity and that such actions cannot subject him to Rule 10b–5 liability. Although the plaintiff argues this point as part of his Rule 9(b) objection, his argument concerns a point of law and not of pleading. We therefore consider this motion as a Rule 12(b)(6) motion to dismiss for failure to state a claim. However couched, the defendant's argument is unconvincing.

Bromberg argues that a lawyer acting in a professional advisory capacity cannot be held liable under Rule 10b–5. He cites *Keene Corp. v. Weber,* 394 F.Supp. 787, 790 (S.D.N.Y.1975), an opinion dismissing a claim for failure to establish personal jurisdiction, and *In re Carter,* SEC Release No. 34–17597 [1981 Transfer Binder], CCH Fed. Sec.L.Rep. ¶ 82,847, reviewing the findings in an SEC disciplinary proceeding, to support his contention. However, plaintiff largely ignores *SEC v. Frank,* 388 F.2d 486, 488–90 (2d Cir.1968), which squarely refutes his argument. In *Frank,* the court approved an injunction enjoining an attorney from violating sections 17(a) and 10(b) of the Securities Act. In denying defendant attorney's appeal, the court noted, "A lawyer has no privilege to assist in circulating a statement with regard to securities which he knows to be false simply because the client has furnished it to him." *Id.* at 489. Thus, were the complaint only to allege claims against Bromberg for filing Ferrovanadium's registration forms, it would be sufficient. However, the complaint also alleges that Bromberg served Ferrovanadium in several other capacities. (Complaint §§ 9 & 16.) Bromberg may be liable in those capacities as well. His liability as such is a question of fact.

In addition, Bromberg argues that he was incapable of understanding the alleged misstatements in the documents at issue. He thereby seeks to place himself within an exception to the *Frank* rule. In discussing that exception, the *Frank* court noted:

[I]t would be unreasonable to hold a lawyer who was putting his client's description of a chemical process into understandable English to be guilty of fraud simply because of his failure to detect discrepancies between their description and technical reports available to him in a physical sense but beyond his ability to understand.

*SEC v. Frank, supra,* 388 F.2d at 489. Whether Bromberg was technically capable of comprehending the alleged misrepresentations is, at most, a question of fact. Thus, Bromberg's effort to dismiss the claim on the basis of this pseudo-professional privilege is unavailing.

### 5. Aiding and Abetting Claims

The plaintiff also asserts aiding and abetting claims against the remaining accountant defendants. Paragraph 52 of the complaint alleges that DH & S (U.S.) aided and abetted the issuance of "materially false and misleading statements" in the 1979 audit, the 1979 annual report, the Form 10 and the May 10, 1981 Form S–12. Paragraph 58 charges DH & S (Aus.) with aiding and abetting the issuance of materially misleading statements in the 1980 Form 10–K and in the 1980 annual report. Neither of these allegations is pled with the particularity Rule 9(b) demands.

The elements of aiding and abetting liability are three: (1) the existence of a securities law violation by a primary wrongdoer; (2) the aider and abettor's knowledge of this violation; and (3) his substantial assistance in the violation. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). The plaintiff's pleadings conclusionally allege the elements of such a claim. For example, paragraph 52 reads:

DH & S aided and abetted the issuance of the materially false and misleading statements set forth in paragraphs 50 and 51 above in that DH & S (a) knew or in reckless disregard of the facts, should have known that the statements were materially false and misleading (b) substantially participated in the issuance of the statements (c) knew or, in reckless disregard of the facts, should have known that its actions furthered the aforesaid material misrepresentations.[25]

Complaint ¶ 52. In *Decker v. Massey-Ferguson, supra,* 681 F.2d at 119–20, the Second Circuit affirmed the dismissal of a similar complaint[26] for failure to comply with Rule 9(b). In so doing, it stated "[t]hese charges are so broad and conclusory as to be meaningless." *Id.* at 120. The pleadings herein are similarly defective. We therefore dismiss the aiding and abetting claim.[27]

Any new aiding and abetting pleading should, at a minimum, accord with the following guidelines. The plaintiff must plead those events which "give rise to a strong inference that the defendants had knowledge of the [primary securities law] violation," *Ross v. A.H. Robins Co., supra,* 607 F.2d at 558; *Barnes v. Schweiker,* 562 F.Supp. 433 (S.D.N.Y.1983). The plaintiff should state the factual basis for his allegations that the defendants "substantially participated" in the alleged fraud. If the basis for those allegations is an independent duty to act, *IIT v. Cornfeld, supra,* 619 F.2d at 927, the plaintiff should so state. The plaintiff should also present the factual basis from which it infers such a duty. *Weinberger v. Kendrick,* 451 F.Supp. 79, 83 (S.D.N.Y.1978). Finally, the plaintiff's aiding and abetting pleadings should specifically reference the primary violations allegedly aided or abetted.

### 6. Conclusion

In many ways, this complaint strikes us as the kind of expeditionary pleading which concerned the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In his opinion, Justice Rehnquist observed that a securities law

> complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.

*Id.* at 740–41, 95 S.Ct. at 1927–28. The settlement value of plaintiff in avoiding dismissal at this stage may be significant.

---

**25.** The other aiding and abetting claim reads:
In addition, DH & S aided and abetted the issuance of the materially misleading statements set forth in paragraphs 35(a), (b) and (c) and 44(a), (d), (e), (f) and (g), some or all of which were set forth in Ferrovanadium's 1980 Annual Report and 1980 10–K in that DH & S (a) knew or, in reckless disregard of the facts, should have known that these statements were materially false and misleading, (b) substantially participated in the issuance or withholding of these material misstatements and omissions, (c) knew or, in reckless disregard of the facts, should have known that its actions furthered the aforesaid material misrepresentations and omissions and (d) by virtue of its position, owed a duty not to disclose false and misleading information to Ferrovanadium ADR holders and the investment community.
Complaint ¶ 58.

**26.** The relevant pleadings in *Decker* read:
"the defendants and each of them knowingly, or with reckless disregard of the truth, concealed from plaintiff and the class the material facts upon which this Amended Complaint is based and facts which would put plaintiff and the class on notice of such material facts an the claims set forth herein.
"the defendants participated in, or knowingly or with reckless disregard for the truth lent material assistance to, and/or acquiesced in the foregoing acts and omissions and ... played and active role in the preparation and dissemination of the false and misleading information and documents specified herein."
*Decker v. Massey-Ferguson,* 681 F.2d 111, 119–20 (2d Cir.1982).

**27.** The pleadings are so deficient that we deem it unnecessary to consider whether proper pleadings could state a claim with respect to the 1979 Ferrovanadium audit. Consequently, we do not at this time address the accountant defendants' objections to such a claim. *See* Defendants Memorandum in Support of Their 12(b)(6) and 9(b) Motions at 17–23.

However, because we believe the pleadings may contain the seeds of a cause or several causes of action and because, like the Second Circuit in *Ross v. A.H. Robins, supra*, 607 F.2d at 547, "we ... hesit[ate] to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings," we afford the plaintiff an additional, albeit final, opportunity to conform the pleadings to Rule 9(b)." *Ross v. A.H. Robins Co., supra*, 607 F.2d at 547. Nevertheless, we will not require the defendants, particularly, the Australian accountants, to come with their witnesses from the far corners of the earth without particularized notice of the claims against them and the facts upon which those claims rest. *Decker v. Massey-Ferguson, Ltd., supra*, 681 F.2d at 121.

IV. *Summary*

The Court grants the defendants' motion pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss all claims against Yarwood Vane & Co. and Deloitte, Haskins & Sells (Aus.) except as to any claims against DH & S (Aus.) arising out of its issuance of the 1980 Ferrovanadium audit.

The Court denies the defendants' motions pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state a claim on which relief can be granted.

Defendant Leo Bromberg's motion pursuant to Fed.R.Civ.P. 9(b) to dismiss for failure to plead fraud with the requisite particularity is granted. The plaintiff may replead its claim against defendant Bromberg within twenty (20) days from the date of this decision.

The motions of defendant Deloitte, Haskins & Sells (United States) and defendant Deloitte, Haskins & Sells (Australia) pursuant to Fed.R.Civ.P. 9(b) to dismiss for failure to plead fraud with particularity are also granted. The plaintiff may replead its claims against these defendants within twenty (20) days from the date of this decision.

SO ORDERED.